[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 30, 2012
JOHN LEY
CLERK

_____

No. 10-14908

_____

D.C. Docket No. 6:09-cv-01440-JA-DAB

THOMAS E. TERRELL,
as Personal Representative of the Estate of Aaron F. Zylstra, Deceased,
KAREN TERRELL,
as the natural parent of Aaron F. Zylstra,
JOHN ZYLSTRA,

Plaintiffs - Appellees,

versus

STEVE SMITH,
individually and in his official capacity
as a duly appointed Police Officer
of the City of Palm Bay, Florida,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 30, 2012)

Before HULL, MARCUS and BLACK, Circuit Judges.

MARCUS, Circuit Judge:

In this civil rights case, Officer Stephan Smith of the City of Palm Bay Police Department appeals the district court's denial of his motion for summary judgment on the basis of qualified immunity. Tragically, Smith used lethal force against Aaron Zylstra in a fast-paced, unfolding scenario in the early morning hours of June 8, 2007, after Zylstra failed to follow Smith's commands and attempted to flee in a vehicle that struck Smith in the process. Zylstra's parents and Thomas Terrell, the personal representative of Zylstra's estate, claim that Smith used excessive force in violation of the Fourth Amendment, and accordingly they seek damages under Title 42 U.S.C. § 1983 and Florida's wrongful death statute.

After thorough review, we conclude that Officer Smith is entitled to qualified immunity. The use of deadly force was reasonable under the facts and circumstances of this case; what's more, there was no clearly established law at the time of the incident that would have given Smith fair notice that his actions violated the Fourth Amendment. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

**I.**

2

In reviewing a district court's denial of a motion for summary judgment based on a claim of qualified immunity, we resolve all issues of material fact in favor of the plaintiffs. McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009). Since the facts offered by the passenger in Zylstra's car, Dann Fazio, are generally more favorable to the plaintiffs than those offered by the police officers, we set forth primarily Fazio's account of the events that night.

On the evening of June 7, 2007, Fazio happened upon Zylstra, a childhood friend, at a bar called "The Hustler" on Route A1A in Palm Bay, Florida, at approximately 9:00 or 10:00 P.M. Fazio had not seen Zylstra in three years, although the two had known each other and been friends since junior high school. Fazio arrived at the bar with another friend, Robert Stanley, but elected to stay on with Zylstra after Stanley left. Fazio and Zylstra left The Hustler sometime between 11:30 P.M. and 12:00 A.M. and went to another bar, The Purple Porpoise, but they quickly left that one too because it was almost empty.[1] They proceeded to still another bar, The Side Pocket, where they remained until its closing time of 2:00 A.M. Fazio and Zylstra shared a pitcher of beer at The Hustler and each drank a pitcher at The Side Pocket. In addition to the beer,

---

[1]According to Fazio, Zylstra drove the entire time that he and Zylstra were together.

3

Zylstra and Fazio each consumed one half bar of Xanax[2] at The Side Pocket. Fazio and Zylstra left The Side Pocket and drove to Zylstra's home.

Upon reaching Zylstra's home, Fazio and Zylstra decided to get high and went in search of crack cocaine. Zylstra drove to the trailer of someone he knew and purchased two "rocks" of cocaine. Instead of following their original plan of consuming the cocaine at Zylstra's residence, Zylstra decided to smoke the crack on Maplewood Drive, a deserted area that he considered to be "safe." Zylstra turned off his headlights but left the engine running, leaving on only the interior dome light. After Fazio and Zylstra each took a "hit" of the crack, police lights illuminated the scene. Fazio said that he then hid the marijuana pipe that they had used to smoke crack "between [his] seat" and stuffed the remaining bars of Xanax that Zylstra had given him into his underwear. Zylstra either spit out or swallowed the remaining crack.

The police officers involved in the incident said that they stopped Zylstra's vehicle because the car had been driven down the street without headlights. Two officers, Clifford Graves and Tom Ribnicky, were working as part of a plain clothes burglary task force during the early morning of June 8, 2007. They were in an unmarked vehicle when they noticed that Zylstra's car was operating without

[2]Fazio described a "bar" of Xanax as consisting of a "four-part pill."

4

headlights. Graves first saw brake lights and then no lights at all in succession. The officers followed the vehicle, also without their lights on, until they came to a stop some distance behind Zylstra's now-parked vehicle. At some point after seeing Zylstra's vehicle, Graves and Ribnicky contacted Palm Bay Police Officer Steve Smith, who was operating as part of the task force in a marked police cruiser. Smith was asked to "check out" Zylstra's vehicle. Smith relayed the message to another uniformed officer, Jasmine Campbell.

Fazio recounted that the two police officers at the scene directed him and Zylstra to exit their vehicle and kneel down behind Zylstra's car while holding their hands above their heads.[3] Fazio said that he knelt immediately behind and slightly to the side of the vehicle. Each officer approached the car from a different side with his weapon drawn. One of the officers remained in front of Fazio, while the other walked towards the driver's side of the vehicle. Although Fazio was compliant with the officers' commands, Zylstra acted as if he were going to kneel down, but instead he turned and jumped back into the vehicle. Officer Smith ran after Zylstra and managed to place himself in the open doorway of Zylstra's car,

---

[3]Fazio and the officers provided disparate accounts of what occurred after the police officers made contact with the occupants of Zylstra's vehicle. Thus, for example, all four officers stated that they were present at the scene, while Fazio recalled only two. Smith also said that he parked in front of Zylstra's vehicle, while Fazio mentioned only a marked police car behind Zylstra's vehicle. We recount here Fazio's narrative of the interaction between the officers and Zylstra during the stop, since his statement of the facts is more favorable to the plaintiffs.

an area that the parties call "the V," as Zylstra attempted to make a U-turn in Smith's direction. Smith continued to run in the V alongside the vehicle as it moved forward, repeatedly warning Zylstra to stop the car. The vehicle's door and frame struck Smith's body as Zylstra attempted to turn the vehicle. Fazio testified that "the under part of the open part of the door was hitting [Smith], kind of pushing him back." After multiple warnings, Smith fired two shots, killing Zylstra.

Zylstra's parents and Terrell filed suit in Florida circuit court, alleging violations of Aaron Zylstra's Fourth Amendment rights and seeking damages under federal and state law. After the case was removed to the United States District Court for the Middle District of Florida, Smith moved for summary judgment on the basis of qualified immunity.[4] The district court denied Smith's motion, and he now appeals.

## II.

Our review of a district court's denial of a motion for summary judgment based on qualified immunity is de novo. Roberts v. Spielman, 643 F.3d 899, 902 (11th Cir. 2011) (per curiam). We resolve all issues of material fact in the

---

[4]Officers Campbell, Graves, and Ribnicky were dismissed from the suit by voluntary stipulation of the parties. The City of Palm Bay was granted summary judgment. As a result, only Smith's qualified immunity claim remains in this appeal.

plaintiffs' favor and approach the facts from the plaintiffs' perspective because "[t]he issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002) (quoting Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998)) (internal quotation marks omitted). In order to overcome summary judgment because of qualified immunity, "the facts in dispute must raise a genuine issue of fact material to the determination of the underlying issue." McCullough, 559 F.3d at 1205.

Qualified immunity affords complete protection to government officials sued individually "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). The purpose of qualified immunity is to protect officials from the chilling effect that a fear of personal liability would create in carrying out their discretionary duties, McCullough, 559 F.3d at 1205, "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee, 284 F.3d at 1194 (internal quotation marks omitted).

7

Under the well-defined qualified immunity framework, a "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (internal quotation marks omitted). Since there is no dispute that Smith was acting in his discretionary capacity in this case, the burden shifts to the plaintiffs to show that qualified immunity is inappropriate. Id. To do so, the plaintiffs must meet the two-part standard recently reaffirmed by the Supreme Court in Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009). First, the plaintiffs must allege facts that establish that the officer violated Zylstra's constitutional rights; and second, the plaintiffs must also show that the right involved was "clearly established" at the time of the putative misconduct. See id. at 232. This inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition." Lee, 284 F.3d at 1194. In Pearson, the Supreme Court concluded that a court may assess these factors in any order. 555 U.S. at 236. In this case, the plaintiffs have failed to establish either prong: Officer Smith's actions, when measured against the version of the facts most favorable to the plaintiffs, did not violate Zylstra's Fourth Amendment rights; nor was the law clearly established at the time of the incident, fairly placing Officer Smith on notice that what he was doing would be unlawful. Pace, 283 F.3d at 1282. In

8

short, Smith is entitled to qualified immunity.

**A.**

The plaintiffs allege that Smith's use of deadly force constituted excessive force in violation of the Fourth Amendment. This claim is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989); McCullough, 559 F.3d at 1205-06. Whether the use of force is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). "In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559 F.3d at 1206 (citing Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1778, 167 L.Ed.2d 686 (2007)). The Supreme Court has reminded us that the officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. This is so because "police officers are often forced to make split-second

judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97. Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396.

We have distilled from Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), three key factors concerning the reasonableness of the use of deadly force. See Vaughan v. Cox, 343 F.3d 1323, 1329-30 (11th Cir. 2003). Thus, an officer may use deadly force to stop a fleeing felony suspect when the officer:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;" (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

Id. at 1329-30 (emphasis removed) (quoting Garner, 471 U.S. at 11-12). Although this list of factors may be relevant in assessing the reasonableness of using deadly force, "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" Scott v. Harris, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778, 167 L.Ed.2d 686 (2007). As we have explained, "[t]he constitutional test for excessive

force is necessarily fact specific." McCullough, 559 F.3d at 1206.

We begin our analysis with the officers' decision to stop Zylstra's vehicle. The plaintiffs broadly claim that Smith used lethal force in the course of a "mere" traffic stop for a civil infraction and that he lacked sufficient personal knowledge to seize Zylstra in the first place. A closer legal analysis of the rapidly transpiring events reveals a significantly more complicated set of facts and legal principles that justified an arrest of Zylstra by Officer Smith.

The statements of Officers Graves and Ribnicky that Zylstra's vehicle was moving down the street at night without lit headlights is uncontroverted. It is equally clear that driving without illuminated headlights at nighttime is a noncriminal traffic infraction in Florida. Every motor vehicle is required to have two front headlights. Fla. Stat. Ann. § 316.220(1). Vehicles "shall display lighted lamps . . . from sunset to sunrise." Id. § 316.217(1)(a). Failure to comply with the illuminated lights statute is "a noncriminal traffic infraction." Id. § 316.217(5). And we have held repeatedly that a law enforcement officer may stop a vehicle for violating traffic laws or applicable equipment regulations. See e.g., United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998). Furthermore, both the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer.

11

See United States v. Hensley, 469 U.S. 221, 232, 105 S. Ct. 675, 83 L.Ed.2d 604 (1985); Voorhees v. State, 699 So.2d 602, 609 (Fla. 1997) (per curiam) ("The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers."); Dewberry v. State, 905 So.2d 963, 967 (Fla. 5th DCA 2005) ("The fellow officer rule, sometimes referred to as the collective knowledge doctrine, allows the collective knowledge of police investigating a crime to be imputed to each member of the investigation. The reach of this doctrine has been extended to searches as well as arrests.").

Thus, Officer Smith plainly was justified under Florida law in stopping Zylstra's vehicle in order to write a traffic citation for driving at night without lit headlights. See Cresswell v. State, 564 So.2d 480, 481 (Fla. 1990) ("The initial stop was valid because a law enforcement officer is clearly entitled to stop a vehicle for a traffic violation. However, the stop must last no longer than the time it takes to write the traffic citation." (internal citations omitted)). Moreover, upon stopping the vehicle, the officers clearly were permitted to ask for identification. See United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) (noting that a stop for a traffic violation permits an investigation of the driver's license and vehicle registration) (citing Delaware v. Prouse, 440 U.S. 648, 657-59, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). And they were also permitted to order Zylstra and

12

Fazio out of the vehicle.  See Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 98 S. Ct. 330, 54 L.Ed.2d 331 (1977).

We turn then to the central question: whether in the face of the unfolding events it was objectively reasonable under the Fourth Amendment for the officer to use deadly force.  Accepting Fazio's account of the tragic events as they unfolded that night, two police officers at the scene directed Fazio and Zylstra to exit the car, kneel down on the ground, and raise their hands.  Fazio complied, but Zylstra exited the vehicle, first acting as if he were going to get on the ground, but he then turned around, ran back to the vehicle, jumped into the car, and attempted to make a U-turn in Smith's direction.  At that point, Officer Smith gave chase, running by the vehicle and inserting himself into the V between the car's frame and door, both of which struck his body.  Fazio and Officer Smith recall Smith moving alongside the vehicle and repeatedly warning Zylstra to stop the car.  On these undisputed facts the officer had probable cause to believe that Zylstra violated Florida law by willfully refusing or failing to stop a vehicle after having been ordered to do so by a law enforcement officer, a third-degree felony.  Fla. Stat. Ann. § 316.1935(1) reads in relevant part this way:

It is unlawful for the operator of any vehicle, having knowledge that he

or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order or, having stopped in knowing compliance with such order, willfully to flee in an attempt to elude the officer, and a person who violates this subsection commits a felony of the third degree . . . .

Moreover, the law does not create a duty for a law enforcement officer to retreat or abandon his efforts to effect an arrest simply because a fleeing felon is noncompliant, a principle that has been statutorily codified in Florida's penal code. See id. § 776.05 ("A law enforcement officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest."). Thus, it cannot be said that, as he ran alongside Zylstra's vehicle, Smith somehow had a legal duty to retreat from his position or abandon his efforts and simply watch Zylstra drive off. Officer Smith had the legal right to arrest a fleeing felon who had committed a felonious act directly in his presence. See id. § 901.15(1) ("A law enforcement officer may arrest a person without a warrant when . . . [t]he person has committed a felony . . . in the presence of the officer.").

Notwithstanding the officer's repeated instruction that Zylstra stop the moving car, the car continued to move and, indeed, struck the officer. Under circumstances like these, "[w]e have . . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or

14

threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." McCullough, 559 F.3d at 1207. Thus, for example, in Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005), we found that an officer's use of lethal force was reasonable under the Fourth Amendment in circumstances less immediately threatening than those suggested by the facts of this case. In Robinson, an officer was positioned between his vehicle and the suspect's vehicle in a gap of "two to four feet at the most." Id. at 1254. The suspect began to move his vehicle forward towards the officer "at a likely speed of around one to two miles per hour." Id. We concluded that the officer's use of deadly force was reasonable under the circumstances because he "had to make a split-second decision of whether he could escape before he got crushed." Id. at 1256. A panel of this Court observed that "[e]ven if in hindsight the facts show that [the officer] perhaps could have escaped unharmed," a reasonable officer could have perceived that the vehicle was being used as a deadly weapon. Id.

Similarly, in Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002) -- which involved a fact pattern that began in a manner strikingly similar to this one -- we upheld an officer's use of deadly force against the driver of a vehicle after a high-speed chase ended with the vehicle having been stopped and surrounded by police officers. A deputy pulled over Davis for driving at night without his headlights

15

illuminated. Id. at 1276. The deputy asked Davis to exit his vehicle after a computer check revealed that Davis had given the deputy false identifying information. Id. at 1276-77. As the officer patted Davis down, Davis broke away and reentered his vehicle. Id. at 1277. The officer then used pepper spray on Davis, who nonetheless managed to escape. Id. After other officers were alerted to the events, a high-speed chase began in which Davis swerved at police cars, nearly collided head-on with an elderly motorist, and drove through a residence's front yard at 50 to 60 miles per hour. Id. Davis' car came to a stop in a cul-de-sac approximately fifteen minutes after the chase began. Id. Four officers' vehicles hemmed Davis in from the left, right, and back; Davis' car faced a curb. Davis remained in his car while the officers yelled at him to exit the vehicle. Id. at 1277-78. Deputy Clark fired two shots at Davis' car through the front windshield. Id. at 1278. The vehicle "began moving forward," and Deputies Clark and Capobianco each then fired five more rounds, killing Davis. Id. When the driver refused to exit the vehicle, that situation, too, justified lethal force "based on [Davis's] aggressive and reckless driving as well as his failure to heed police warning." McCullough, 559 F.3d at 1207. Importantly, we further said that "[b]y the time of the shooting, Davis had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with

16

which Davis was armed." Pace, 283 F.3d at 1282.

In Long v. Slaton, 508 F.3d 576 (11th Cir. 2007), again a panel of this Court granted qualified immunity to an officer who had used deadly force after his police cruiser had been occupied by a mentally unstable individual who did not comply with the officer's command to stop the car. Although the individual was reversing away from the officer in the cruiser, the Court observed that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." Id. at 581 (citing Pace, 283 F.3d at 1282). We further noted the "obvious" fact that "Long could have quickly shifted gears and accelerated towards [the officer] at any time. An objectively reasonable officer would have known this fact." Id. at 581 n.7.

Finally, in McCullough, we again held that an officer was entitled to qualified immunity in another Fourth Amendment excessive force case involving the use of a vehicle as a deadly weapon. The driver of a truck suspected of having been involved in a drug transaction led police officers on a high-speed chase. 559 F.3d at 1202-03. Just as in Pace, the vehicle came to a stop, surrounded by the officers. See id. at 1203. The suspect refused to show his hands or reply at all to the officers' commands. Id. At that moment, another officer's vehicle became stuck after skidding into the suspect's truck. Id. Upon hearing that the other

17

officer's vehicle was stuck and the truck's engine revving, the police opened fire. Id. The suspect backed up his truck and then drove it towards an officer's cruiser, forcing the officer to jump onto the hood of his own car to avoid being hit. Id. As the suspect began to drive away, the officers ran alongside the passenger side of the suspect's vehicle, continuing to fire at the truck. Id. at 1204. It slowly came to a stop, and the suspect tragically was pronounced dead at the scene. Id. In McCullough, we cited each of these other cases, observing that all of them involved a driver using a vehicle "in a dangerous and aggressive manner" that provided the officers with ample reason to believe that the driver "posed a threat of serious physical harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded." Id. at 1208.

The same is true here. Taking the facts in a light most favorable to the plaintiffs, Smith pursued Zylstra in order to arrest him and clearly instructed him to stop the car. Instead of complying with Smith's orders, Zylstra attempted to turn the car in a manner that caused it to strike the officer. The fact that the vehicle made contact with Smith's body alone makes the circumstances of this case far graver and more immediate than the threat of bodily harm arising out of the encounters in Long and Robinson, neither of which involved the suspect's vehicle hitting the officer. Any misstep by Officer Smith could have caused him

18

to fall and be crushed under the weight of the moving vehicle. Although it is of no legal import because the test of reasonableness under the Fourth Amendment is an objective one, see Graham, 490 U.S. at 388, we note in passing that Fazio himself said that he would have shot Zylstra if he had been in Smith's position.

Moreover, according to Fazio's account, he was kneeling down in a position so close to the vehicle that any vehicular movement in reverse could have caused the car to hit him as well. Finally, we observe that a second police officer was standing watch over him. As a result, there were at least three individuals who faced the immediate and utterly foreseeable risk of being struck by Zylstra's fleeing car, at least one of whom (Officer Smith) was actually hit by the moving vehicle.

The reasoning of our cases in this area readily spells the outcome in this one. Officer Smith was forced to make a split-second decision concerning whether the use of lethal force was necessary. Beyond himself, two other people were within a few feet of the moving vehicle as these rapidly unfolding and uncontrolled events transpired. "Even if in hindsight the facts show that [the officer] perhaps could have escaped unharmed," Robinson, 415 F.3d at 1256, an objectively reasonable law enforcement officer could well have perceived that the moving vehicle was being used as a deadly weapon, especially after the driver had

been repeatedly ordered to stop. In short, Smith was attempting to make an arrest that he had the legal right to make while standing in a position where he was legally entitled to be. Zylstra refused to heed Smith's commands to stop the vehicle and turned the car "in a dangerous and aggressive manner which provided the officers with probable cause to believe that [Zylstra] . . . posed a threat of serious physical harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded." McCullough, 559 F.3d at 1208. The use of lethal force was objectively reasonable under the Fourth Amendment.

**B.**

In this case we could end our analysis with our holding that Officer Smith did not violate Zylstra's Fourth Amendment rights. Nevertheless, we turn to the second question anyway: whether the law was clearly established and fairly placed Officer Smith on notice that his conduct was clearly unlawful under the peculiar circumstances of the case. We do so in order to make a complete record in the face of this tragic shooting, and we hold that the plaintiffs have failed to carry their burden on this prong as well.

The Supreme Court has said that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

20

reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001). This analysis must be undertaken in the specific crucible of the case, and not as a broad general proposition. Id. at 201. At its core, the question is one of fair notice: "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202; see also Hope v. Pelzer, 536 U.S. 730, 740-41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); Marsh v. Butler County, Alabama, 268 F.3d 1014, 1031 (11th Cir. 2001) (en banc).

The plaintiffs can demonstrate that the contours of the right were clearly established in several ways. First, the plaintiffs may show that "a materially similar case has already been decided." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). Second, the plaintiffs can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." Id. (citing Hope, 536 U.S. at 741). Finally, the conduct involved in the case may "so obviously violate[] th[e] constitution that prior case law is unnecessary." Id. (citing Lee, 284 F.3d at 1199). Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time

21

by the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court. See id. We examine each of these bases in turn.

First, the plaintiffs may establish that the right was clearly established by pointing to a "materially similar case" decided by the Supreme Court, this Court, or the Florida Supreme Court. Id. at 1159. This category consists of cases where "judicial precedents are tied to particularized facts." Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002). In assessing whether previous cases clearly establish the law under the "materially similar" inquiry, we ask whether the factual scenario that the official faced "is fairly distinguishable from the circumstances facing a government official" in a previous case. Id. at 1352. If so, the cases are not materially similar and, thus, provide insufficient notice to the official to clearly establish the law. Id.

If anything, an examination of our cases largely establishes the opposite conclusion from the one that the plaintiffs urge us to draw. Thus, "[w]e have . . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." McCullough, 559 F.3d at 1207. The cases that are most similar to the

facts of this case -- cases that we have already thoroughly examined[5] -- granted the officer qualified immunity. Plainly, Smith would not have been placed on notice from a materially similar case from the United States Supreme Court, this Court, or the Florida Supreme Court that his actions were unreasonable under the Fourth Amendment.

The plaintiffs also may show that a constitutional right was clearly established through a "broader, clearly established principle [that] should control the novel facts [of the] situation." Mercado, 407 F.3d at 1159. "[S]ome broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." Vinyard, 311 F.3d at 1351. However, the principle must be established with "obvious clarity" by the case law so that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Id. In other words, an official action is not protected under qualified immunity simply because "the very action in question" has not been held unlawful before, but "in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640,

---

[5]Neither Long nor McCullough had been decided at the time of this incident -- meaning that they could not clearly establish the law -- but Robinson and Pace had been decided before the shooting in this case.

107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Having found no basis in our existing excessive force cases to put the officer on notice that his conduct would be unlawful, all that remains is the seminal Supreme Court case of Garner. In Garner, two police officers responded to a "prowler inside call." 471 U.S. at 3. Upon arriving at the scene, a woman on the porch of a neighboring house said that she had heard glass being smashed and saw someone break in next door. Id. One officer then entered the backyard of the house next door, at which point an individual darted out from the back door of the house and into the yard. Id. The suspect stopped at a chain-link fence at the edge of the property. Id. The officer was able to see the suspect's face and hands with the aid of a flashlight and was "reasonably sure" that the suspect was unarmed. Id. The officer yelled at the suspect to halt. Id. at 4. Instead of stopping, the suspect began to climb the fence; the officer, certain that the suspect would escape if he surmounted the fence, fatally shot him in the back of the head. Id. The Supreme Court concluded that the use of force was excessive under the Fourth Amendment, but noted other circumstances in which the use of deadly force would be reasonable:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly

24

force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Id. at 11-12.

But Garner cannot clearly establish the law under the facts of this case. In the first place, in sharp contrast with Garner, Zylstra threatened the officer with a deadly weapon by driving his car in a dangerous manner, and Smith repeatedly warned him to stop. See id. at 11-12. Moreover, the Supreme Court noted in Brosseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004), that both Garner and Graham were cases "cast at a high level of generality," which means that they can clearly establish the law "in an obvious case . . . even without a body of relevant case law." Id. at 199. This case is not an "obvious" one; in fact, in Brosseau the Supreme Court found that the sweeping language of Graham and Garner did not provide fair notice when the facts of that case involved "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." Id. at 200. Not surprisingly, the Supreme Court concluded that "this area is one in which the result depends very much on the facts of each case." Id. at 201. Thus, although Graham and Garner provide us at least with a general framework with which to

25

assess the facts of the case, it is undeniable that they did not afford fair notice to Officer Smith that the use of deadly force under these circumstances would violate the Fourth Amendment. See Pace, 283 F.3d at 1283 ("[W]hen we look at decisions such as Garner and Graham . . . we do not see the kind of clear law (clear answers) that would apply with such obvious clarity to the circumstances of this case that only an incompetent officer or one intending to violate the law could possibly fail to know that what the police did here violated federal law.").

Finally, "the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." Vinyard, 311 F.3d at 1350 (emphasis omitted). This inquiry is another kind of "obvious clarity" assessment, see id., that is applicable when "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law," Lee, 284 F.3d at 1199 (quoting Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000)).

The instant case does not fall into this "narrow exception." See id. Prior cases that have fit into the exception involved, for example, a police officer who

26

allegedly allowed his canine to attack for two minutes a prone and wholly compliant suspect who had stolen twenty dollars worth of snacks, see Priester, 208 F.3d at 927; a police officer who allegedly slammed a suspect's head against the trunk of his cruiser after the suspect had been arrested and fully secured, see Lee, 284 F.3d at 1199; and a group of police officers who allegedly threw a secured suspect headfirst into the pavement before kicking him repeatedly, see Slicker v. Jackson, 215 F.3d 1225, 1227-28 (11th Cir. 2000).

In short, the clearly established law as interpreted by the United States Supreme Court, this Court, and the Florida Supreme Court would not have given Officer Smith fair notice that his actions would violate the Fourth Amendment. The fact-specific precedent of this Court suggested precisely the opposite, and neither a broader clearly established principle nor the words of the Fourth Amendment alone provided sufficient guidance. The second qualified immunity prong, therefore, also resolves in the officer's favor.

## III.

In sum, Smith's actions were reasonable under the circumstances and did not violate Zylstra's Fourth Amendment rights, nor was there any clearly established law at the time that would have given him fair warning that the use of deadly force would be unconstitutional. Accordingly, we reverse and remand for

further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**