[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13077

_____

SHEBA ETHIOPIAN RESTAURANT, INC.,
d.b.a.
Queen of Sheba Ethiopian Restaurant,

                                        Plaintiff-Appellee,

*versus*

DEKALB COUNTY, GEORGIA,
HON. JEFF RADER,
HON. KATHIE GANNON,
JOSEPH COX,
JOHN JEWETT,
ANDREW A. BAKER,

                                        Defendants-Appellants,

ZACHARY L. WILLIAMS,
et al.,

                                                Defendants.

                    ———————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-04400-WMR

                    ———————————

Before LUCK, BRASHER, and HULL, Circuit Judges.

LUCK, Circuit Judge:

Sheba Ethiopian Restaurant, Inc., an Ethiopian restaurant in Georgia, sued DeKalb County and several county officials for race discrimination. Sheba alleged that the county selectively enforced its fire and zoning codes against its restaurant and other Ethiopian restaurants. The county and its officials moved to dismiss, and the district court denied the motion. In denying the motion, the district court concluded that the officials violated clearly established law by discriminating against the restaurant based on its race and that the county had a policy or custom of discrimination.

We part from the district court. As to Sheba's claims against the officials, there's no binding law in this circuit clearly establishing that a corporation can have a race or that officials can

discriminate against a corporation because of the corporation's race. The officials are thus entitled to qualified immunity. As to Sheba's claims against the county, we do not have pendent appellate jurisdiction over that factually and legally distinct appeal. So we reverse the part of the district court's order denying qualified immunity to the officials and dismiss the county's appeal.

## FACTUAL BACKGROUND

In 1998, Sheba opened for business in Atlanta, Georgia. Sheba was a closely held corporation, owned and operated by Solomon Abebe, a black man from Ethiopia. From the start, Sheba's "late-night customers [were] predominantly" black—from Ethiopia and other East African counties.

Sheba was a restaurant-turned-nightclub, licensed by DeKalb County to offer food, alcohol, and live music. Sheba would often hire DJs who'd play music late into the night. And although it didn't have a dance floor, Sheba allowed its customers to dance throughout the restaurant. The restaurant also had a hookah lounge. Sheba was licensed to serve alcohol until 3:55 a.m. on weekdays and until 2:55 a.m. on Saturdays and Sundays.

In 2008, ten years after the restaurant opened, the county amended its zoning code. These amendments reclassified certain establishments as "nightclubs" or "late night establishments." The amendments defined *nightclubs* to include any "commercial establishment dispensing alcoholic beverages for consumption on the premises and in which dancing and musical entertainment is

allowed." DeKalb Cnty. Code of Ordinances ch. 27, art. 9, § 9.1.3. The amendments defined *late night establishments* to include "any establishment licensed to dispense alcoholic beverages for consumption on the premises where the establishment is open for use by patrons beyond 12:30 a.m." *Id.*

The amendments required all nightclubs and late night establishments located within 1500 feet of a residential property to obtain a special land use permit. Sheba fell within *both* definitions. It was a nightclub because it served alcohol and allowed dancing and music. It was a late night establishment because it dispensed alcohol past 12:30 a.m. And Sheba was located within 1500 feet of a residential property. Even though Sheba fell within both categories, the county didn't require it to obtain a special land use permit. Instead, the county "grandfathered" Sheba in and allowed it to operate as a legal nonconforming late night establishment.

By all accounts, Sheba's relationship with the county proceeded rather smoothly for seven or so years following these amendments. The relationship started to sour, however, in 2015, when Martha Gross—a private citizen who lived near Sheba and several other Ethiopian restaurants—"spearheaded" a campaign to "cripple" the Ethiopian restaurant community. Gross spoke at the county's public meetings and posted on social media about "her desire to prohibit" certain Ethiopian restaurants and hookah bars "from operating during late hours . . . either by removing grandfather[ed] status" or by "preventing the establishments from obtaining [special land use permits]."

To that end, Gross worked with the county to target Ethiopian restaurants.  According to Sheba, County Commissioner Jeff Rader "effectively commandeered the [c]ounty's planning and zoning departments, requiring directors and staff in those departments . . . to carry out Martha Gross's directive[]" to "target[] Ethiopian . . . restaurants that offer[ed] [h]ookah service for heightened and arbitrary code enforcement."

In 2016, shortly after Gross initiated her campaign, the county upped its enforcement efforts by forming a "Late Night Task Force" to "randomly select[] and order[] existing restaurants to complete and submit what it call[ed]" a "letter of entertainment."  The letter of entertainment asked whether the restaurant served as a late night establishment and/or a nightclub.  The county required Sheba to complete a letter of entertainment in late 2016, when Sheba filed its annual business license renewal application.  In its letter, Sheba stated that it was a late night establishment (not a nightclub), and the county approved Sheba's business license, saying "grandfathering renewed for [late night establishment]."

Over the next few months (in early 2017), the county's task force members—including representatives of the Fire Marshal's Office and the Code Enforcement Division—visited Sheba for a series of inspections.  During these inspections, the task force members cited Sheba for code violations, including overcrowding by exceeding occupancy limits, use of sparklers and open flames, failure to comply with prior orders, failure to obtain permits for

construction, and operating as a nightclub (recall that Sheba failed to inform the county that it operated as a nightclub in its letter of entertainment). Sheba alleged that these were "petty infractions" and that "[n]one of the alleged violations were a matter of life safety."

The county came down hard on Sheba for these violations. In March 2017, the fire marshal—having cited Sheba for over-crowding and using sparklers in champagne bottles—issued a "No-tice of Fire Hazard" directing Sheba to cease all operations until it received approval to reopen. A month later, in April 2017, the county decided to (1) revoke Sheba's alcohol license, certificate of occupancy, and 2016 business license; (2) deny its 2017 business li-cense; and (3) terminate its legal nonconforming use status under the zoning code. The county maintained that these decisions were justified by Sheba's repeated code violations, the restaurant's change in use, and public safety concerns.

What came next for Sheba was a drawn-out process of com-pliance efforts and appeals. As to the fire code violations, Sheba closed and "[i]mmediately . . . consulted with its architect and sub-mitted the appropriate applications to the [county's] building and fire officials." Sheba also "promptly corrected" "[e]very fire hazard issue identified by the [c]ounty," yet the county "refused to issue the [required] permit[s]." But despite its "repeated efforts to en-gage and satisfy" the county's requirements, Sheba was unable to reopen its business.

As to the other code violations, Sheba appealed and achieved mixed results.  So, for example, Sheba appealed the county's decision to revoke (and deny) its business license.  The review board reversed the county's decision and ordered the county to reinstate Sheba's business license.  Sheba also appealed the county's decision to revoke its certificate of occupancy.  But the zoning board of appeals denied that appeal.  Consistent with these rulings, the county issued the business license but refused to issue Sheba's certificate of occupancy and alcoholic beverage license.

Gross's campaign to shut Sheba down continued into the fall of 2017.  Unhappy with Sheba's successful business license appeal, Gross emailed various officials (including Commissioner Rader) a list of "17 grounds for denying Sheba's business license."  She asked them to "do what you can to stop th[e] issuance of a business license."  "Minutes later," Commissioner Rader's chief of staff responded to Gross, informing her that Commissioner Rader "received the email and [was] reviewing it with [another official] and the law department."  The next day, Gross emailed the fire department about "ways to prevent Sheba from getting" a certificate of occupancy, saying that it was "a shame that the [c]ounty lawyer who handled the [business license] appeal bungled it so badly."

Sheba alleged that its interactions with the county were not unique but reflected a broader pattern of selective enforcement.  Sheba mainly focused on two Ethiopian restaurants that faced similar mistreatment.  Both restaurants were black-owned and had majority-black customers.  The first restaurant, Day & Night, was

cited by the city in 2015 for fire code violations.  The county ordered the restaurant "to cease operating until [it obtained] all approvals."  Day & Night was "unable to obtain the approvals and was forced to close."  The second restaurant, Aroma Lounge, was cited by the county in 2016 for fire code violations.  The county ordered that it, too, "cease operating until all approvals were provided."  Aroma Lounge "was unable to obtain the approvals and was forced to close."  Gross worked behind the scenes to close the restaurant.

Sheba asserted that, while Ethiopian restaurants faced these hurdles, the county let similar issues slide when it came to restaurants that "cater[ed] to predominately white late-night clientele."  For example, Bench Warmers Sports Grill was cited for fire code violations, yet the county didn't shut it down.  Instead, the county simply had Bench Warmers contact it "to review [its] current use," allowing the bar to continue on "unimpeded."  Tin Lizzy's was also near a residential district, but the county granted it a special land use permit that allowed the restaurant to "sell alcohol until 4:00 a.m."

## PROCEDURAL HISTORY

For years, Sheba chased the county and its officials in and out of state court before finally filing this case in federal court.  *See Sheba Ethiopian Rest., Inc. v. DeKalb Cnty.*, 820 F. App'x 889 (11th Cir. 2020).  We exhaustively detailed that procedural history in Sheba's first appeal to this court.  *Id.* at 893–94.  For our purposes this time around, we can keep things short.

Sheba filed this case in July 2019, suing the county and seven county officials.[1] In its complaint, Sheba brought two counts. First, Sheba sued the county for race discrimination under 42 U.S.C. section 1981. Second, Sheba sued the county *and* the officials for conspiring to violate its civil rights under 42 U.S.C. section 1985(3). Specifically, Sheba alleged that the defendants conspired with Gross to violate its civil rights by discriminating against the restaurant on the basis of its race as proscribed by section 1981.[2]

The county and its officials moved to dismiss. As to the county, they argued that Sheba failed to state a claim under sections 1981 and 1985(3) for race discrimination because Sheba is a corporation and so it doesn't have a race. As to the officials, they argued that they were entitled to qualified immunity because it was "not clearly established in the Eleventh Circuit that Sheba, a

---

[1] The officials are County Commissioner Jeff Rader, County Commissioner Kathie Gannon, Fire Marshal Joseph Cox, Fire Inspector John Jewett, Director Andrew Baker, Chief Operating Officer Zachary Williams, and Chief Building Officer David Adams.

[2] In its complaint, Sheba also alleged that the defendants "conspired with Gross to deprive Sheba of . . . equal protection of the laws." On appeal, the defendants argued that, "[t]o the extent Sheba allege[d] a conspiracy to violate its constitutional rights, res judicata and the law-of-the-case doctrine prevent Sheba from relitigating those rights." Sheba never responded to this argument. It has therefore forfeited any equal protection claim. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("Issues not clearly raised in the briefs are considered abandoned." (quoting *Marek v. Singletary*, 62 F.3d 1295, 1298 n. 2 (11th Cir. 1995))).

corporation, can acquire a racial identity or suffer race discrimination." Sheba, for its part, disagreed. Relying mostly on district court and out-of-circuit decisions, Sheba argued that it was clearly established that corporations could bring a race discrimination claim.

The district court denied (for the most part) the motion to dismiss. It concluded that, for three reasons, a corporation's right against race discrimination was clearly established under section 1981. First, "[m]any circuit courts . . . have interpreted" language from the Supreme Court saying that corporations *cannot* have a racial identity "as dicta and have allowed corporations to assert [section] 1981 claims." Second, "there appears to be some indication from the Supreme Court that the circuit courts' conclusions on this issue are sound." Third, "the Supreme Court determined that a corporation can have religious beliefs that are subject to constitutional protections." For these reasons, the district court denied the motion to dismiss as to the county and all but two officials.[3]

The county and the remaining officials timely appealed.

---

[3] The district court granted the motion to dismiss as to two of the seven officials (Chief Operating Officer Williams and Chief Building Officer Adams) because it concluded there were "no allegations that [those two officials] took any action that would suggest participation in the alleged conspiracy." This ruling is not on appeal.

## STANDARD OF REVIEW

"We review de novo our own jurisdiction," *Morales v. U.S. Att'y Gen.*, 33 F.4th 1303, 1307 (11th Cir. 2022), and the district court's ruling on a motion to dismiss, *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). And "[w]e review a district court's denial of an immunity defense de novo." *McCullough v. Finley*, 907 F.3d 1324, 1330 (11th Cir. 2018) (cleaned up).

## DISCUSSION

We split our discussion in two. First, we conclude that the officials are entitled to qualified immunity because it was not clearly established that a corporation could have a race or suffer race discrimination under section 1981. Second, we determine that we do not have pendent appellate jurisdiction over the county's appeal.

### The Officials

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (cleaned up).

To qualify for the immunity, the "government official [must first prove] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294–95 (11th Cir. 1998) (quotation omitted). Here, there's no dispute that the county officials were acting within their discretionary authority when they oversaw Sheba's licensing.

Where the officials were acting within their discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To meet that burden, the plaintiff must show "(1) that the . . . official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Fuqua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021) (cleaned up). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, "the contours of [the] right [must be] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). We've identified three ways for the law to be clearly established:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle

21-13077                Opinion of the Court                13

> that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the [statute] that prior case law is unnecessary.

*Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (cleaned up). We look to the law as it was interpreted at the time of the challenged conduct by the United States Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court. *See id.*

In assessing whether the law is clearly established, we must keep a couple of things in mind. First, where a plaintiff claims that an official violated a statute, our inquiry must be statute-specific: an official's conduct may violate one statutory right that is clearly established but retain immunity for violating another right that isn't clearly established. *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("[O]fficials sued for violations of rights conferred by a statute or regulation, like officials sued for violation of constitutional rights, do not forfeit their immunity by violating some other statute or regulation."); *see also Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1286 (11th Cir. 1998) (same). "[O]fficials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages." *Davis*, 468 U.S. at 194 n.12. This is consistent with the purpose of qualified immunity: to hold officials liable *only* for clearly established violations of law. A clearly established violation of one law does not equate to a clearly established violation of another law that may result in additional (unforeseen) liability.

Second, the Supreme Court has emphasized the "longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation omitted). "[T]he clearly established law must be particularized to the facts of the case." *Id.* (quotation omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (cleaned up); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." (quotation omitted)).

With that, we turn to the facts of this case. Sheba sued the officials under section 1985(3) for conspiracy. Section 1985(3) "*creates* no rights" but merely "provid[es] a civil cause of action when some otherwise defined federal right . . . is breached by a conspiracy." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979). Here, Sheba alleged that the defendants conspired to violate its rights under section 1981 by discriminating against it on the basis of race. So we ask whether it was clearly established that an official could be liable under section 1981 for discriminating against a corporation based on the corporation's race. It wasn't.

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. To state a claim under section

1981 for race discrimination, "a plaintiff must allege (1) he is a member of a racial minority, (2) the defendant intended to racially discriminate against him, and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1308 (11th Cir. 2010).

Sheba's claim fails because it wasn't clearly established—under the first prong—that Sheba was a "member of a racial minority." Long ago, the Supreme Court said in dicta that "a corporation . . . has no racial identity and cannot be the direct target of the [city's] alleged discrimination." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977); *see also Conn. Gen. Life Ins. v. Johnson*, 303 U.S. 77, 87 (1938) (Black, J., dissenting) ("Corporations have neither race nor color."). In light of this language from *Arlington Heights*—and the total absence of binding law in our circuit contradicting it—we can't say that "every reasonable official would have understood that [discriminating against a corporation] violates" section 1981. *al-Kidd*, 563 U.S. at 741.

Looking to the three ways a law can be clearly established only confirms this result. First, there is no "materially similar case" that would support imposing liability on the officials. *Terrell*, 668 F.3d at 1255 (quotation omitted). The closest case—and the one Sheba relies on—is *Webster v. Fulton County*, 283 F.3d 1254, 1256 (11th Cir. 2002). In that case, a corporation alleged that it had filed a "lawsuit charging Fulton County with a custom or policy of disparate-treatment racial discrimination" and that Fulton County retaliated against the corporation by "refus[ing] to award

[government] contracts to [the corporation] in retaliation for having filed th[e] lawsuit." *Id.* at 1256. We held—in addressing the corporation's section 1981 retaliation claim—that "[i]n a situation such as the one presented by [that] case, [s]ection 1981's protections extend to companies such as [the plaintiff]." *Id.* at 1256 n.3.

This case differs meaningfully from *Webster* because Sheba brought a *discrimination* claim, not a *retaliation* claim. And the elements of those two claims are different. "To state a retaliation claim under [section] 1981, a plaintiff must allege a defendant retaliated against him because the plaintiff engaged in statutorily protected activity." *Jimenez*, 596 F.3d at 1311. By contrast, "[t]o state a claim for . . . discrimination under [section] 1981, a plaintiff must allege (1) he is a member of a racial minority, (2) the defendant intended to racially discriminate against him, and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Id.* at 1308. The plaintiff's racial identity is not an element of a section 1981 retaliation claim but is an element of a section 1981 discrimination claim like the one Sheba asserts.

This distinction between the two claims makes sense. A plaintiff can be retaliated against for protected activity—like reporting or opposing race discrimination—whether the plaintiff has a race or not. *See Webster*, 283 F.3d at 1256 (finding retaliation when a corporation was punished for filing a race discrimination lawsuit). But a plaintiff cannot suffer race discrimination under section 1981 unless it has a race. *See Jimenez*, 596 F.3d at 1308. Put another way, a retaliation claim is based on conduct, something

corporations can do, but discrimination is based on race, something our law has yet to impute to corporations. The fact, then, that a corporation can state a retaliation claim (where there is no race requirement) does not clearly establish that a corporation can state a discrimination claim (where there is a race requirement).

Second, to show that the law is clearly established, "the plaintiff[] can [also] point to a broader, clearly established principle that should control the novel facts of the situation." *Terrell*, 668 F.3d at 1255 (cleaned up). "[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard*, 311 F.3d at 1351.

The district court took this tack, concluding that the county officials violated clearly established law because "[i]t is clearly established that [section] 1981 covers racial discrimination." "As a general principle, we can all agree with that statement." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1283 (11th Cir. 2008); *see, e.g.*, *Bryant v. Jones*, 575 F.3d 1281, 1300 (11th Cir. 2009) ("We have often noted the patently obvious illegality of racial discrimination in public employment." (quotation omitted)). But that (by itself) isn't enough. "While the general proposition that it is illegal to discriminate against a person on the basis of race is clearly established, whether the defendant violated clearly established law *depends on*

*the particular facts of each case.*" *Brown v. Cochran*, 171 F.3d 1329, 1333 (11th Cir. 1999) (emphasis added).

Two main principles guide our analysis. One, the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up). It's not enough to broadly ask (as the district court did) whether discrimination is illegal. *See Griffin Indus. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007) ("[T]he Fourteenth Amendment's broad command that no state shall 'deny to any person within its jurisdiction the equal protection of the laws' may, as it does here, simply operate at too high a level of generality."). Two, "officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages." *Davis*, 468 U.S. at 194 n.12. And so, in this case, we must look to whether Sheba's *specific* cause of action was clearly established.

Applying those principles here—and looking to "whether the violative nature of [the officials'] *particular* conduct [was] clearly established," *Mullenix*, 577 U.S. at 12 (cleaned up)—we can't say that every reasonable official would've known that section 1981 prohibits racial discrimination against a corporation. It is not at all "obvious" that corporations have a race or can suffer discrimination based on their race. *See Vinyard*, 311 F.3d at 1351. Indeed, as the district court observed, the "federal circuit courts have wrestled with" this issue "over the past several decades." The Supreme Court has even suggested that corporations *cannot* state a

race discrimination claim.  *See Arlington Heights*, 429 U.S. at 263. "When the courts are divided on an issue so central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability."  *Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017).

In similar circumstances, we've found that officials are entitled to qualified immunity from race discrimination claims.  In *Rioux*, for example, a deputy fire chief (who was a public employee) filed a race discrimination claim after he was demoted.  *Rioux*, 520 F.3d at 1273.  We noted that "the right to be free from employment discrimination was clearly established at the time of [the plaintiff's] demotion."  *Id.* at 1283.  "However," we said, "the 'clearly established' prong of the qualified immunity analysis asks the question in light of the specific context of the case, not as a broad general proposition."  *Id.* at 1283 (quotation omitted).  And there, the evidence showed that the officials who demoted the plaintiff had "mixed motives."  *Id.* at 1284.  In light of those mixed motives, we found no violation of clearly established law:  "[w]e [could not] say that, even assuming [the officials] were acting with improper race-based animus . . . , reasonable officials . . . would have known that demoting [the plaintiff] violated clearly established federal law."  *Id.* at 1285.  The same is true here.

Third, the final way to show clearly established law is "by convincing us that the case is one of those rare ones that fits within the exception of conduct which so obviously violates the [statute at issue] that prior case law is unnecessary."  *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) (cleaned up).  No one has argued

that this case presents one of those rare instances—and for good reason. Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. We can't say it's obvious from the statute's text that corporations can state a race discrimination claim. For all of these reasons, Sheba hasn't met its burden of showing that the officials violated clearly established law. The officials are thus entitled to qualified immunity.

Against all this, Sheba raises four arguments—all unavailing. First, Sheba points to the Supreme Court's recognition that "the [c]ourts of [a]ppeals to have considered the issue have concluded that corporations may raise [section] 1981 claims." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 473 n.1 (2006). But the Supreme Court expressly left the issue open in *Domino's*, noting that—because the corporation in that case had settled—it "ha[d] no occasion to determine whether, as a corporation, [the plaintiff] *could* have brought suit under [section] 1981." *Id.* So *Domino's* didn't clearly establish that corporations may raise section 1981 claims. And the fact that *other* circuits have decided the question can't clearly establish the law in this circuit. *See Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) (rejecting the argument that "a consensus of cases of persuasive authority would be able to establish law clearly").

Second, Sheba asserts that, "[a]t least implicitly, the Supreme Court has recognized that corporations can have racial characteristic[s] by allowing white-owned corporations to challenge

contractor (minority) set asides." *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). But in those cases, the Court simply held that "the Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments." *Adarand*, 515 U.S. at 222; *Croson*, 488 U.S. at 493. Neither decision considered whether corporations can state a race discrimination claim. As the Supreme Court has explained, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., v. Aviall Servs.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). So these decisions don't help.

Third, Sheba presses that, because "religious beliefs can be imputed to corporations," racial identity must be attributed to corporations as well. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the Supreme Court held that a "for-profit corporation [may] engage in the 'exercise of religion' within the meaning of [the Religious Freedom Restoration Act of 1993]." *Id.* at 713. While Sheba may be right that *Hobby Lobby*'s logic might support attributing a race to corporations under section 1981, we can't say that *Hobby Lobby* "placed the statutory . . . question beyond debate." *al-Kidd*, 563 U.S. at 741. Indeed, *Hobby Lobby* dealt with different facts under a different statute. Because it was an "unsettled question of law whether [*Hobby Lobby*] would be extended to this

case," the officials are entitled to immunity. *Daniel v. Taylor*, 808 F.2d 1401, 1403 (11th Cir. 1986).

Fourth, Sheba contended at oral argument that whether a corporation can bring a race discrimination claim simply goes to who may assert the right against racial discrimination, not to whether that right is clearly established in the first instance. But even if that is correct, Sheba doesn't attempt to assert another's rights; it's asserting its own rights. This case thus concerns more than *who* may assert a race discrimination claim. This case presents the question whether the county officials committed race discrimination at all—in light of the fact that the target was a corporation.

In other words, the illegality of the conduct itself was an open question in this case. Consider, for example, a law that read: "a person is liable for attacking a police officer." If a *teacher* was attacked and sued her assailant under this law, the question wouldn't simply be whether the teacher had standing. Instead, the question would be whether there was a violation of our hypothetical statute at all. The same is true here. The question isn't just whether a corporation can bring a section 1981 claim. Instead, it's whether the county officials can be liable even though their conduct—targeting a corporation—was not clearly covered by the statute. *Cf. Auriemma v. Rice*, 910 F.2d 1449, 1458 (7th Cir. 1990) (granting qualified immunity because it wasn't "clearly established . . . that whites as a class came within the protection" of

section 1985(3)).  Under the doctrine of qualified immunity, they cannot.

In sum, we do not address whether corporations can—or cannot—state a race discrimination claim under section 1981.  We hold only that there was no clearly established law in our circuit determining that officials *are* liable under section 1981 for discriminating against a corporation.  In this absence, the officials in our case were entitled to qualified immunity.

### The County

That leaves us with Sheba's claim against the county.  But we lack pendent appellate jurisdiction over the county's appeal of the district court's order denying the county's motion to dismiss.

We generally have appellate jurisdiction only over "final decisions of the district courts."  28 U.S.C. § 1291.  But "[a] public official . . . may file an interlocutory appeal of the denial of qualified immunity."  *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1344 (11th Cir. 2013) (cleaned up).  And "[a]n appeal from the denial of qualified immunity may implicate this [c]ourt's discretionary pendent appellate jurisdiction to review otherwise non-appealable matters."  *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016).  "Pendent appellate jurisdiction is limited and rarely used."  *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019).

"Pendent appellate jurisdiction is proper if the non-appealable matters are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure

meaningful review of the latter." *Smith*, 834 F.3d at 1292 (quotation omitted). So, if we can "resolve the qualified immunity issue in [a] case without reaching the merits" of an otherwise nonappealable interlocutory ruling, that ruling generally "does not fall within our pendent appellate jurisdiction." *Moniz v. City of Ft. Lauderdale*, 145 F.3d 1278, 1281 n.3 (11th Cir. 1998).

We lack jurisdiction over the county's appeal. Because we resolved the officials' qualified immunity appeal on the clearly established prong without reaching the merits, the county's appeal—which would require us to go further and reach the merits of Sheba's race discrimination claim—is not inextricably intertwined with or necessary for deciding the officials' appeal. *See, e.g.*, *Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997) (finding no pendent appellate jurisdiction because we "resolve[d] the qualified immunity issue without reaching the merits of the remaining questions raised by the individual defendants").

## CONCLUSION

The officials are entitled to qualified immunity because there was no law clearly establishing that they could be held liable under section 1981 for discriminating against a corporation based on its race. We reverse the part of the district court's order denying qualified immunity to the officials and remand for the district court to grant the officials' dismissal motion. But, because we do not have pendent appellate jurisdiction over the county's appeal, we dismiss that part of the appeal for lack of jurisdiction.

21-13077                Opinion of the Court                25

REVERSED and REMANDED in part, and APPEAL DIS-MISSED in part.