[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14581
Non-Argument Calendar
_____

D.C. Docket No. 6:11-cv-01341-GKS-GJK


EARL E. REEDER,

Plaintiff-Appellant,

versus

CITY OF DAYTONA BEACH POLICE CHIEF,
Michael Chitwood, et al.,

Defendants,

HARRY OAKLEY,
Officer,
STEVE YUNICK,
Officer,
JAMES S. THOMAS,
Officer
DENNIS THOMAS,
Sgt.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 11, 2014)

Before WILLIAM PRYOR, JORDAN and JILL PRYOR, Circuit Judges.

PER CURIAM:

Earl Reeder appeals *pro se* the summary judgment against his amended complaint of an unlawful entry to and seizure of evidence from his home by four officers of the Police Department for the City of Dayton Beach, *see* 42 U.S.C. § 1983, and the denial of his motion for leave to file a second amended complaint. Although the district court did not abuse its discretion when it denied Reeder's motion for leave to amend his complaint, the district court erred by entering summary judgment in favor of the officers based on qualified immunity. The district court impermissibly weighed the evidence in favor of the officers' accounts that they were invited into Reeder's home and discredited Reeder's deposition testimony that he did not consent to the officers' entry. Because the evidence, viewed in the light most favorable to Reeder, establishes that the officers entered his home in violation of the Fourth Amendment, we vacate the judgment in favor of the officers and remand for further proceedings.

2

## I. BACKGROUND

Reeder's amended complaint stemmed from an encounter two years earlier with the four police officers. The officers visited Reeder to investigate whether he had drugged and raped a woman inside his home the previous evening. Although the officers and Reeder agreed that he opened his front door to talk to the officers, their stories about what then transpired differed substantially.

Reeder's complaint alleged that, as he opened his door, Officers Harry Oakley and James S. Thomas rushed into his home brandishing taser guns and demanding that Reeder relinquish the sheets on his bed. When Reeder told the two officers to leave or produce a search warrant, they handcuffed him and placed him in a patrol vehicle so Officer Steve Yunick and other officers could search Reeder's home. Twenty minutes later, Sergeant Dennis Thomas arrived on the scene and walked quickly through Reeder's home. Sergeant Thomas asked Reeder to sign a form that stated he consented to the search of his home, but Reeder refused. Reeder was charged with possessing illegal drugs and drug paraphernalia, but those charges were later dismissed.

During his deposition, Reeder testified that he woke to a "really loud banging," he ran to his kitchen after he heard the sound of glass breaking, and he opened a window through which he saw Officers Thomas and Oakley. Reeder, who knew Officer Thomas, agreed to open his front door to speak to the officers.

3

As Reeder opened his door, he saw Officer Oakley wielding a taser gun, and Officer Thomas rushed inside Reeder's home and ordered him to "[p]ut [his] hands up." Officer Thomas inquired where the victim had slept the previous evening and demanded that Reeder surrender his sheets. When Reeder told the officers to "get out of [his] house" and asked them for a search warrant, Officer Oakley threatened to shoot Reeder with a taser gun and instructed Reeder to "walk back into [his] living room." Because Reeder continued to protest the officers' presence in his home, Officer Thomas handcuffed Reeder. In the meantime, Reeder heard something tapping on a sliding glass door in his living room and saw Officer Yunick remove a piece of wood that was wedged in the track of the door. Officer Thomas escorted Reeder to a patrol car, where he waited approximately 20 minutes while officers searched his home. Reeder objected to the officers' presence after Sergeant Thomas arrived at the scene, and Reeder later refused the Sergeant's offer to "work this out and get rid of [the drug] charges" if Reeder signed a form consenting to the search of his home. Reeder also refused to sign a consent form when asked to do so by Officer Thomas. As Officer Thomas transported Reeder to the police station, Officer Thomas asked Reeder about a bottle of liquor handled by the victim, and they returned to Reeder's house to retrieve the item from a garbage can outside his house.

Reeder also testified that he did not see a crack pipe in his house before the police arrived, but he "smell[ed]" the victim smoking crack that morning and "kick[ed] her out." And Reeder insisted that, during his interview at the police station, he stated that he did not consent to the search of his home, but Officer Thomas interrupted him with the response, "[w]e're not here to talk about that right now." Reeder denied that he consented to have his mouth swabbed for forensic testing during his interview and that a lady appeared at his home two to three weeks later with a warrant to collect the sample. Reeder also testified that he surrendered his clothes at the conclusion of his interview when asked to do so by Officer Thomas.

The officers moved for summary judgment and to strike Reeder's deposition as a sham. *See* Fed. R. Civ. P. 56(a), (h). The officers argued that they were entitled to qualified immunity because Reeder consented to the search of his home, and in the alternative, because exigent circumstances existed to justify their entry without a warrant. And the officers alleged that Reeder's deposition "inherently contradict[ed] [his] statements [during his post-arrest interview] that he consented to the search" of his home.

The officers submitted a video recording of Reeder's interview. The video began by showing Reeder removing his pants and underwear and stacking them neatly on the interview table. When Officer Thomas entered the room, Reeder

5

stated that he took "his clothes off because [he] wanted to submit them . . . for evidence." Thomas allowed Reeder to narrate the events of his evening with the victim because he had already "told [Thomas] everything in the world without [him] asking . . . a question." Reeder described how the victim arrived at his home intoxicated, ingested alcohol and Xanax, and then accused him of rape when he failed to obtain crack cocaine as she requested.

The video showed that Reeder was aiding the officers in their investigation. Reeder maintained "that . . . [he] had no problem when you knocked on the door this morning, opening the door at all because [he] really want to get this resolved and [he was] not trying to run from it." Reeder acknowledged that he had asked Thomas to "turn [his patrol car] around" and return to Reeder's home, to collect "a liquor bottle" that Reeder had disposed of in a garbage can outside his home. And Reeder explained that he overlooked the crack pipe that was sitting on the same table as the bottle because he was rushing to "get all [the] alcoholic stuff out" in case his "probation officer came around." Reeder also acknowledged that, after the officers "told [him] why [they] were there . . . [he] said 'take the sheets,'" and that that there was "one [sheet that he] brought out of the room" for the officers. Reeder reiterated, "yeah, I told you 'take the sheets' and here I'm offering you my boxers, everything that I can possibly give y'all." Reeder also consented to undergo a

6

"buccal swab," and he insisted that the officers "[could] do anything" and that he would provide "[a]nything else [the officers] need[ed]."

The officers submitted affidavits about their encounter with Reeder. Officers Thomas and Oakley averred that Reeder "invited [them] to enter" his home; they "proceeded into the living room area where [the officers] informed Mr. Reeder that [they] were there to investigate rape allegations against him"; they saw illegal drugs and drug paraphernalia lying in plain view in Reeder's home; and Reeder denied any wrongdoing and agreed to "fully cooperate in the investigation." Thomas stated that Oakley "requested permission . . . to search" Reeder's home and "Reeder consented," and Oakley stated that "Reeder invited [the officers] to take the bed sheets . . . that the alleged victim slept on" before consenting to a search of his apartment. Officer Thomas also stated that Reeder agreed to sign a consent to search form, but later he refused to do so. Officer Yunick averred that he saw Officers Thomas and Oakley inside Reeder's home, after which he entered the home through a sliding glass door that had been left unlocked, and that he learned later that Reeder had consented to the search. Sergeant Thomas stated that he was told Reeder had consented to the search by Officer Oakley or Thomas; he saw a crack pipe lying on a table in Reeder's living room; and Reeder verified that he had invited the officers to enter his home.

In depositions, Officers Oakley and Thomas testified that Reeder admitted them to his home. Oakley testified that Thomas asked Reeder if they could "come inside and talk," he was "nervous[ly] cooperative," and when they asked him to relinquish the sheets on which the victim had been sleeping, he "volunteered his clothes" and he "t[ook] [them] to the living room where [her] sheets were on the couch." And Oakley verified that he and Officer Thomas obtained Reeder's consent before entering his home. Officer Thomas testified that Reeder "invit[ed] [them] into his house . . . , demanding [they] take the sheets . . . ." and that Reeder was "more than happy to comply with [the] request" to enter and escorted the officers down the hallway to the living room.

Reeder filed a motion for leave to file a second amended complaint, which the district court denied. *See* Fed. R. Civ. P. 15(a). The district court determined that Reeder could have included his claims of false imprisonment, malicious prosecution, and violations of state law in his amended complaint and that he failed to give a reason to excuse filing his proposed amendment before the expiration of the deadline for discovery. The district court also determined that the proposed amendment would prejudice the officers, require additional discovery, and delay the disposition of the case.

The district court denied the officers' motion to strike Reeder's testimony. Although the district court found "variations in [Reeder's] testimony [that affected]

8

[its] weight . . . as evidence," it determined that those "inconsistencies [were] not explicit enough to strike the deposition as a sham." The district court explained that it was relying on Reeder's videotaped interview as "the best evidence."

The district court initially denied the officers' motion for summary judgment, but later the district court vacated that decision and granted the motion. Based on Reeder's statements that he "had no problem . . . opening the door at all" for the officers, willingly turned over evidence, and instructed an officer to return to his home to retrieve the bottle of liquor, and because Reeder "never hint[ed] that he did not voluntarily consent to the officers' entry . . . or search" and "confirm[ed] that he consented to the search, explaining that he was willing to do anything to clear his name," the district court found that Reeder "consented to the [officers'] search of his home." The district court determined that there was "no constitutional error in entering the house or the subsequent search" and that the officers were entitled to qualified immunity.

The district court also rejected what it perceived to be Reeder's attempt to "create an issue of fact by providing testimony (almost three years after the incident)" to contradict the officers' accounts of the incident and to satisfy "the threshold required to deprive the police officers, who were trying to do their duty, of qualified immunity." The district court explained that it had decided to "rely on [Reeder's] police interview as a more accurate portrayal of the facts" because

9

Reeder's "deposition testimony . . . [was] inconsistent with his prior statements . . . [and] [was] so self-serving that it lack[ed] credence."

## II. STANDARDS OF REVIEW

We review *de novo* a summary judgment based on qualified immunity. *Terrell v. Smith*, 668 F.3d 1244, 1249–50 (11th Cir. 2012). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). We are required to interpret the evidence and draw all reasonable inferences from that evidence in the light most favorable to the non-movant. *Terrell*, 668 F.3d at 1250.

## III. DISCUSSION

Reeder challenges the summary judgment in favor of the officers on the ground that a material dispute of fact exists about whether he consented to a search of his home. Reeder also challenges the denial of his request for leave to file a second amended complaint. We address each argument in turn.

*A. The District Court Erred By Entering Summary Judgment for the Officers Based on Qualified Immunity.*

The district court erred by entering summary judgment in favor of the officers. Under the Fourth Amendment, police officers cannot enter a home without a warrant unless they obtain the voluntary consent of the person whose property is searched or consent from a third party who shares common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797

(1990). The record reveals that a genuine factual dispute exists about whether the officers entered Reeder's home without his consent. On the one hand, the officers submitted affidavits and deposition testimony that Reeder invited them into his home. On the other hand, Reeder provided deposition testimony that the officers barged into his home, the officers disregarded his demands that they leave, and he refused to sign a consent to search form. Summary judgment was inappropriate because of the direct contradictions in the parties' evidence.

Under Reeder's version of events, the officers were not entitled to qualified immunity. Qualified immunity does not apply if an official violates a plaintiff's constitutional rights, and "[a] warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013). The evidence, viewed in the light most favorable to Reeder, establishes that Officers Thomas, Oakley, and Yunick invaded and searched Reeder's home without his consent in violation of the Fourth Amendment. And Reeder's deposition testimony established that Sergeant Thomas joined the officers inside Reeder's house after being told by Reeder that he did not consent to the entry or search. The officers argue that they are entitled to qualified immunity on the alternative ground that exigent circumstances existed to justify their entry to Reeder's home without a warrant, but

11

"[w]e decline to address [that argument] here, preferring that the district court address it in the first instance." *Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 800 (11th Cir. 1992).

The district court neglected its duty to credit Reeder's version of events. The district court inferred that Reeder consented to the search based on his willingness to cooperate with the officers, but we have cautioned that "it is inappropriate to 'sanction entry into the home based upon inferred consent.'" *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)). And while cooperation is a factor used to determine whether consent is voluntary, *see United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984), it is not dispositive in ascertaining whether consent was given. *See United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) ("[C]onsent [is] not a function of acquiescence to a claim of lawful authority but rather [must be] given freely and voluntarily."). There is no doubt that Reeder's deposition testimony was inconsistent in many respects with his videotaped statement, but the district court could not discount the deposition testimony on that basis. "Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices," *Feliciano*, 707 F.3d at 1252 (internal quotation marks and citation omitted), because "credibility determinations and the weighing of evidence

12

'are jury functions, not those of a judge,'" *id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)). Although Reeder's deposition testimony that he protested the officers' presence in his home is in tension with his videotaped statement that he eagerly opened the door to speak to the officers and told them to take his sheets, the district court denied the officers' motion to strike Reeder's deposition testimony because the burden rested with "the jury [to] assess the credibility of [Reeder's] testimony." And the district court erred by rejecting Reeder's deposition testimony as self-serving because "that alone does not permit [a court] to disregard [testimony] at the summary judgment stage." *Id.* at 1253.

The officers argue that Reeder's deposition testimony was "utterly discredited" by his videotaped statement, *see Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007), but we disagree. A party is entitled to have his testimony considered unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* In *Scott*, police officers produced a videotape recording of a high speed chase involving multiple violations of traffic laws that "directly contradicted" the plaintiff's complaint that he was a cautious and controlled driver whose civil rights were violated when officers rammed him to stop his vehicle. *Id.* at 378–80, 127 S. Ct. at 1775–76. But the officers in this case do not possess the same type of objective, real-time evidence of their encounter

with Reeder at his home to establish that his deposition testimony is false. Reeder's videotaped statement depicts his interview with the officers after his arrest and transportation to the police station. Reeder admits during his interview that he welcomed the officers' presence at his home and that he willingly identified and relinquished all evidence that he thought would exonerate him of the allegations of rape, but he does not state that he consented to the officers' entry or that he admitted them to his home. Unlike the videotape evidence in *Scott*, Reeder's videotaped statement does not unequivocally establish that he consented for the officers to enter his home.

### B. The District Court Did Not Abuse Its Discretion By Denying Reeder's Request to Amend His Complaint.

The district court did not abuse its discretion by refusing to allow Reeder to amend his complaint a second time. Federal Rule of Civil Procedure 15(a)(2) states that the district court "should freely give leave [to amend a complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), and those principles give the district court leeway to deny a motion to amend when it determines that the amendment is intended to cause undue delay or would unduly prejudice the defendant. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). Reeder filed his motion more than one month after the close of discovery, which had been extended once at his request. The district court determined that the delay would prejudice the officers' ability to preserve evidence related to the new claims; would require

14

additional discovery from the victim, Reeder, and potentially other persons; and would delay the disposition of Reeder's case. The district court reasonably decided to deny Reeder's request to further amend his complaint.

## IV. CONCLUSION

We **AFFIRM** the denial of Reeder's motion for leave to file a second amended complaint. We **VACATE** the summary judgment in favor of the officers based on qualified immunity, and we **REMAND** for further proceedings.