[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10231
_____

D.C. Docket No. 4:17-cv-00017-CDL


RICHARD D. JACKSON,
LORETTA S. JACKSON, and
E.D.J., a minor child, by and through
her parents RICHARD D. JACKSON
and LORETTA S. JACKSON

                                                        Plaintiffs-Appellants,

versus

DAVID M. MCCURRY,
SANDI D. VELIZ,
BO OATES,
JOSH KEMP, and
RYAN SMITH

                                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(March 12, 2019)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and CONWAY, [*] District Judge.

PER CURIAM:

This appeal arises from a course of events at Chattahoochee County Middle/High School in Cussetta, Georgia. The events began when a student, E.D.J., was accused of making fun of another student, *M*, for not making the volleyball team. After Josh Kemp, an administrative assistant to Assistant Principal Bo Oates and Principal Sandi Veliz, investigated the allegation, Oates decided to search E.D.J.'s cellphone to see if she had sent texts about *M*. After Oates did so, he returned the cellphone and concluded that E.D.J. had not violated any school rule. In response to the search, E.D.J.'s father, Richard Jackson, confronted several school officials by phone and in person. As a result of these interactions, Superintendent David McCurry decided that Jackson was a threat to the safety of the school's employees and students and prohibited Jackson from appearing on school premises except to bring E.D.J. to and from school and to attend E.D.J.'s volleyball games. After Jackson mentioned the possibility of litigation, McCurry also allegedly told Jackson he was not permitted to attend a public meeting of the local school board to discuss his grievances. In spite of what McCurry's letter said, when Jackson attempted to attend one of E.D.J.'s volleyball games, he was

---

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

removed from school premises by Veliz, Kemp, and Ryan Smith, the school's resource officer.

Jackson and his wife, Loretta Jackson, filed a civil-rights complaint, 42 U.S.C. § 1983, on behalf of themselves and E.D.J., which asserted that Oates violated E.D.J.'s rights under the Fourth Amendment when he searched her cellphone, McCurry violated Jackson's rights under the First Amendment by restricting his communication with school personnel and access to school property and by prohibiting him from addressing the school board, and Smith and other school officials violated Jackson's rights under the Fourth Amendment when they removed him from school premises. The complaint also asserted several state-law claims which are not at issue in this appeal. After discovery, the district court granted summary judgment in favor of the school officials on the ground that qualified immunity barred Jackson's federal claims. We affirm.

## I. BACKGROUND

E.D.J. was a twelfth-grade student at Chattahoochee County Middle/High School during the 2016–17 school year. In August 2016, rumors circulated that E.D.J. was gossiping about *M*. These rumors made it back to *M*, who confronted E.D.J. and threatened her. After school that day, E.D.J. told school officials about *M*'s threat. The next day, Josh Kemp, an administrative assistant to Assistant Principal Bo Oates and Principal Sandi Veliz, began gathering information about

3

the incident from *M* and two other students, *A* and *B*. *M* told Kemp that E.D.J. had been making fun of her for not making the volleyball team. *A* also told Kemp that E.D.J. had been making fun of *M* and had sent text messages to *A* and *B* about *M*. *B* told Kemp that there was "drama" between E.D.J. and *M* and corroborated the accusation that E.D.J. had been sending texts to other students about *M*.

After interviewing *A* and *B*, Kemp called E.D.J. to his office to hear her side of the story. Oates was present during this interview. Kemp and Oates questioned E.D.J. about whether she had been sending messages to students about *M*, but she denied the allegation. According to E.D.J., Oates told her to unlock her cellphone and give it to him so he could see if E.D.J. had been sending messages about *M*. E.D.J. asserts that she refused to give Oates permission to search the contents of her phone, but this refusal did not deter him from doing so. Oates had E.D.J. identify some of her text recipients because they were not listed in her phone under their real names but were instead identified by nicknames or emojis. After Oates reviewed E.D.J.'s messages with *B*, he allegedly continued to examine conversations between E.D.J. and her family members, best friend, and ex-boyfriend. After Oates concluded his investigation, he told Kemp he did not believe E.D.J. had done anything wrong and returned the phone to her.

Later that evening, E.D.J. told her father, Richard Jackson, about what had happened at school. Over the next few days, Jackson repeatedly called

4

Superintendent David McCurry, Principal Veliz, and Assistant Principal Oates. According to McCurry, in one call, Jackson left a message stating that a school administrator committed a "Fourth Amendment violation" against his daughter and that he "will proceed with legal action." Jackson testified that he told school officials that a lawsuit against school officials would be an "option," but he denied making "any definite threat of suit." Jackson called McCurry on another occasion to request to speak at an upcoming school board meeting, and McCurry allegedly informed him that he "could not attend the meetings, nor could [he] speak at the meetings" because he "had threatened litigation."

Jackson also went to E.D.J.'s volleyball practice to speak with her coaches about the incident. After Jackson spoke with them, the coaches reported to McCurry and Veliz that Jackson acted aggressively and said that he would "show Mr. Oates what intimidation was" because he believed that "Oates had intimidated his daughter." Jackson also allegedly inquired into the identity of a student he believed had played a role in the events involving his daughter. For his part, Jackson denied that he acted aggressively or made any threats against Oates. After hearing from the coaches, McCurry reviewed video footage of Jackson's meeting with the coaches with Ryan Smith, a deputy sheriff who serves as the school's resource officer and determined that Jackson posed a threat to the safety of the school's employees and students.

5

A few days later, Jackson returned to the school to speak with Veliz. Based on what he had heard from the coaches, McCurry inferred that Jackson intended to confront Oates, so he met Jackson at the front door of the school and prohibited him from entering. McCurry instructed Jackson to refrain from any further communication with school officials or students and to direct all future communication to the school board's attorney. McCurry had asked Smith to stand by while he confronted Jackson, and Smith observed the encounter from inside the door. When McCurry reentered the school, he informed Smith that he told Jackson that he was not permitted on school premises. McCurry directed Smith to remove or arrest Jackson if Smith saw him on school property.

A few days after that, McCurry sent a letter to Jackson recounting what McCurry believed had occurred during the meeting with the volleyball coaches and stating that the school district had "determined your conduct in this regard is disruptive and contrary to the establishment of a healthy educational environment for the students of our school system." The letter barred Jackson from making any unauthorized appearance on school premises or at any extracurricular activities conducted by school officials at which students are present. But the letter *did* permit Jackson to appear on school premises to transport E.D.J. to and from school and to attend E.D.J.'s volleyball games.

6

About one month later, on October 4, 2017, Jackson and his wife attended a volleyball game at the school, which was senior night for the girls on the team, including E.D.J. Jackson complied with the demand articulated in McCurry's letter and sat in the designated parents' area. Kemp and Smith were also in attendance and noticed that Jackson was present. Kemp called Veliz for instructions on whether he should ask Jackson to leave. Veliz initially told Kemp that she did not want to unnecessarily remove Jackson and create a scene. Kemp told Veliz that he believed Jackson had threatened the school's coaches and had been banned from school property. Veliz proceeded to call McCurry, who told her that they could remove Jackson if necessary and that he would support their decision regardless of what they decided to do. Veliz then instructed Kemp to remove Jackson from the gymnasium after the conclusion of the senior night activities. As of that time, neither Veliz, Kemp, nor Smith had read the letter McCurry sent to Jackson, and they did not know that Jackson was permitted to be on school premises during E.D.J.'s volleyball games. McCurry testified that he did not remember that the letter permitted Jackson to be present on school property for that purpose when he spoke with Veliz.

Smith and Kemp approached the bleachers where Jackson was sitting and asked to speak with him. According to Jackson, when he approached Smith, Smith grabbed his arm, put his other hand on his pistol, and walked Jackson to the

concession area. Jackson asserts that he verbally objected to Smith touching him and asked Smith to remove his hand from his pistol, which Smith refused to do. Kemp followed Smith and Jackson, and when they reached the concession area, Smith told Jackson that he needed to leave. Jackson responded by informing Smith that McCurry had expressly permitted him to attend E.D.J.'s volleyball games in a letter, but when Jackson could not produce the letter, Smith reiterated his demand that Jackson leave the building. Smith explained to Jackson that he could be arrested for criminal trespass if he attempted to stay on school property. According to Jackson, Smith grabbed his arm again and escorted him outside the gym. Later that evening, Veliz asked Kemp to retrieve from her office a copy of the letter McCurry wrote to Jackson and read it to her. Only then did they realize that Jackson was permitted to attend the game and that they had made a mistake.

Jackson and his wife filed a civil-rights complaint, 42 U.S.C. § 1983, on behalf of themselves and E.D.J. asserting (1) a claim under the Fourth Amendment against Oates in his individual capacity for searching E.D.J.'s cellphone; (2) a claim under the Fourth Amendment against Smith, Veliz, and Kemp in their individual capacities for removing Jackson from school premises during the volleyball game; (3) a claim under the First Amendment against McCurry in his individual and official capacities for restricting Jackson's communications with school personnel and access to school property; and (4) another First Amendment

8

claim against McCurry in his individual and official capacities for preventing Jackson from addressing the school board. Jackson also asserted state-law claims for assault, invasion of privacy, and false imprisonment.

After discovery, the school officials moved for summary judgment and the district court granted their motion. Jackson did not respond to the officials' motion for summary judgment with respect to the official-capacity claims against McCurry, so the district court ruled that those claims were abandoned. The district court concluded that none of Jackson's individual-capacity claims stated a violation of federal law, and that even if they did, the officials were shielded by qualified immunity because none of the alleged actions violated clearly established law. The district court also ruled that Jackson's state-law claims were barred by the state-law doctrine of official immunity because Jackson "failed to point to any evidence from which a reasonable jury could conclude that Defendants acted with actual malice."

## II. STANDARD OF REVIEW

We review a summary judgment *de novo* and "construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016). We also review *de novo* a grant of qualified immunity. *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir. 1991).

9

### III. DISCUSSION

We divide our discussion in four parts. First, we consider Jackson's argument that the search of E.D.J.'s cellphone violated the Fourth Amendment. Second, we examine Jackson's argument that McCurry violated the First Amendment when he prohibited Jackson from appearing on school premises. Third, we address Jackson's claim that McCurry violated the First Amendment when he barred Jackson from speaking to the school board. And fourth, we consider Jackson's claim that his rights under the Fourth Amendment were violated when Smith, Veliz, and Kemp removed him from the volleyball game. We conclude that all of the school officials are entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To obtain dismissal based on qualified immunity, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). If he was, the burden shifts to the plaintiff to overcome the official's qualified immunity. *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017). Because "there is no dispute" that

10

all the school officials were "acting in [their] discretionary capacity," "the burden

shifts to the plaintiffs to show that qualified immunity is inappropriate." *Terrell v.*

*Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012).

To overcome the qualified-immunity defense, a plaintiff must prove that

"the defendant violated her constitutional rights" and "that, at the time of the

violation, those rights were 'clearly established . . . in light of the specific context

of the case, not as a broad general proposition.'" *Gaines v. Wardynski*, 871 F.3d

1203, 1208 (11th Cir. 2017) (citation omitted). We may address these issues in any

order, *Pearson*, 555 U.S. at 236, "but, to survive a qualified-immunity defense,

[the plaintiff] must satisfy both showings." *Wardynski*, 871 F.3d at 1208 (quoting

*Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017)).

A plaintiff may "demonstrate that the contours of the right were clearly

established in one of three ways." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204

(11th Cir. 2012) (alteration adopted) (citation and internal quotation marks

omitted). First, a plaintiff may establish that "a materially similar case has already

been decided." *Id.* (citation and internal quotation marks omitted). Second, the

plaintiff may "point to a broader, clearly established principle that should control

the novel facts of the situation." *Id.* (alterations adopted). Third, "the conduct

involved in the case may so obviously violate the [C]onstitution that prior case law

is unnecessary." *Id.* at 1205 (alterations adopted). The precedents that clearly

11

establish law for these purposes are those of the Supreme Court, this Court, and the highest court of the state where the challenged action occurred. *See, e.g.*, *Smith*, 668 F.3d at 1256; *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

### A.  *The Search of E.D.J.'s Cellphone Did Not Violate Clearly Established Law.*

Jackson argues that the search of E.D.J.'s cellphone by Oates violated the Fourth Amendment, but we conclude that even on the assumption that Jackson is correct, Oates is shielded from liability by qualified immunity because the search did not contravene clearly established law. To resist this conclusion, Jackson relies principally on the decisions in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), and *Riley v. California*, 573 U.S. 373 (2014), but these decisions—whether considered individually or jointly—do not clearly establish any principle of law that would mandate the conclusion that the search of E.D.J.'s cellphone was unlawful.

In *T.L.O.*, the Supreme Court established general parameters for searches of school students by public-school officials. The Court held that searches of the person or property of a student by public-school officials are governed by "a Fourth Amendment standard of reasonableness that stops short of probable cause." 469 U.S. at 341. Under this standard, determining whether a search conducted by school officials was reasonable involves "a twofold inquiry" that considers "first . . . 'whether the . . . action was justified at its inception,'" *id.* (quoting *Terry*

12

*v. Ohio*, 392 U.S. 1, 20 (1968)), and "second . . . whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (citation and internal quotation marks omitted). The Court explained that "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341–42 (footnote omitted). And the Court said that "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

As we have previously explained, in *T.L.O.*, the Supreme Court formulated the standard applicable to searches by school officials in terms of a "series of abstractions," and the Court "did not attempt to establish clearly the contours of a Fourth Amendment right as applied to the wide variety of possible school settings different from those involved in *T.L.O.*" *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 828 (11th Cir. 1997) (en banc). Although "general statements of the law are not inherently incapable of giving fair and clear warning" to officials, *United States v. Lanier*, 520 U.S. 259, 271 (1997), "in the light of pre-

existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

It was far from obvious that the search of E.D.J.'s phone was unlawful at its inception under *T.L.O.* Oates searched E.D.J.'s cellphone based on *M*'s accusation that E.D.J. had made fun of her in text messages sent to other students, and this allegation was corroborated by the reports of two other students, *A* and *B*, and the policies outlined in the school handbook prohibit both bullying and rude or disrespectful behavior towards other students. It is at least arguable that this evidence supplied "reasonable grounds for suspecting that the search" of E.D.J.'s phone would "turn up evidence" that she "violated. . . the rules of the school." *T.L.O.*, 469 U.S. at 342.

Nor does *T.L.O.* "place[] the . . . constitutional question" whether the search was justified in scope "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Nothing in *T.L.O.* establishes that searching a high-school senior's text messages for evidence of bullying would be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342. And although Oates allegedly expanded the search and reviewed messages between E.D.J. and persons other than *A* and *B*, including E.D.J.'s ex-boyfriend and family members, it is undisputed that E.D.J. labeled many of the contacts in her phone using emojis and nicknames. As the district court explained, "Oates

14

knew that [E.D.J.] could label her contacts in any manner she chose" and so "could reasonably assume that [E.D.J.] could disguise her contacts and any messages from them." As a result, it is arguable that a reasonable school official could conclude that expanding the search to encompass those text messages would be "reasonably related to the objectives of the search." *T.L.O.*, 469 U.S. at 342.

*Riley* does not alter our conclusion. In *Riley*, the Supreme Court held that "a warrant is generally required before" police officers may search "the information on a cell phone," "even when a cell phone is seized incident to arrest," 573 U.S. at 401, but it did not attempt to spell out how its holding could be transposed to the setting of a public school. True, because the reasoning of *Riley* treats cellphone searches as especially intrusive in comparison to searches incident to arrest of personal property, *see id.* at 393–98, a search of a student's cellphone might require a more compelling justification than that required to search a student's other personal effects under *T.L.O. Cf. Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374 (2009) (holding that a strip search of a student by school officials is "categorically distinct" and "requir[es] distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings"). But that conclusion hardly "follow[s] immediately" from *T.L.O.* and *Riley* "and thus was not clearly established by" the holdings of those decisions.

15

*Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (citation and internal quotation marks omitted).

*Riley* held only that the exception to the warrant requirement for searches incident to arrest does not extend to searches of information contained in cellphones, and *T.L.O.* held that "[t]he warrant requirement . . . is unsuited to the school environment," 469 U.S. at 340, so there is room for a reasonable school official to conclude that *Riley* has no application to school searches. And in the light of the permissible disagreement about the implications of *Riley* for school searches, we cannot say that Oates was "plainly incompetent" or "knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also al-Kidd*, 563 U.S. at 743 ("Qualified immunity gives government officials breathing room to make reasonable . . . judgments about open legal questions.").

Jackson also cites a pair of out-of-circuit district-court opinions, *see Gallimore v. Henrico Cty. Sch. Bd.*, 38 F. Supp. 3d 721 (E.D. Va. 2014), *Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622 (E.D. Pa. 2006), and an opinion from one of our sister circuits, *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623 (6th Cir. 2013), but these decisions cannot clearly establish that Oates's conduct was unlawful. As we have repeatedly explained, "a district court case cannot clearly establish the law for qualified immunity purposes." *Wardynski*, 871 F.3d at 1211; *see also Gonzalez v. Lee Cty. Hous. Auth.*, 161 F.3d 1290, 1302 n.38 (11th Cir.

16

1998) (explaining that "our precedent firmly states that a district court opinion cannot" clearly establish law for qualified immunity). Nor can a decision from one of our sister circuits do so. *See, e.g.*, *Loftus*, 690 F.3d at 1206 (a decision from one of our sister circuits "cannot provide 'clearly established' law in this Circuit"). And in any case, the decisions cited by Jackson are distinguishable. *See G.C.*, 711 F.3d at 633–34 (search of a student's cellphone based on "general background knowledge" that he abused drugs and was depressed and because he used the cellphone in class in violation of school policy was unjustified at its inception); *Gallimore*, 38 F. Supp. 3d at 725 (expansion of a search to a student's cellphone was not "reasonably related" to the objective of "finding evidence of drug use on the school bus earlier that day" because "the cell phone could not have contained drugs"); *Klump*, 425 F. Supp. 2d at 640–41 (although seizure of a student's phone because he used it during school hours in violation of school policy was justified, school officials were not entitled to use the phone to call other students to determine whether they were also using phones).

### B. *McCurry Did Not Violate Clearly Established Law When He Prohibited Jackson from Appearing on School Premises.*

Jackson argues that his rights under the First Amendment were violated when McCurry sent him a letter prohibiting him from appearing on school premises except for the purpose of bringing E.D.J. to and from school and attending E.D.J.'s volleyball games. Regardless of whether Jackson is correct

17

that this action violated the First Amendment, we conclude that McCurry's decision did not contravene clearly established law and so he is entitled to qualified immunity.

Jackson contends that McCurry's letter constituted an overbroad restriction of his right to free speech in violation of *Broderick v. Oklahoma*, 413 U.S. 601 (1973), because—in Jackson's view—the letter prohibited him from contacting teachers, coaches, and students outside of school premises, but this is a misreading of the letter. McCurry's letter recounted the circumstances of Jackson's encounter with the coaches of E.D.J.'s volleyball team and informed him that "other than dropping off and picking up your child at school or at one of our facilities, you are to make no unauthorized appearance either at your daughter's school or at any extracurricular activity conducted by our faculty and staff and where students are present." The letter also instructed Jackson to "remain in the designated area for parents" if he attends a school event such as a volleyball game. And it told Jackson "not to attempt to contact or talk with the coaches, teachers, or students of our School System."

McCurry's letter purports to ban Jackson only from appearing on school premises to contact school officials and students. In the light of the letter's obvious emphasis on the circumstances in which Jackson is permitted to be present on school premises, any reasonable reader would conclude that the

18

letter's prohibition on "contact[ing] or talk[ing] with the coaches, teachers, or students" refers only to on-campus communications. This reading is confirmed by McCurry's uncontroverted deposition testimony, in which McCurry acknowledged that he "can't dictate what [Jackson] does at somebody's home" and stated that the purpose of the letter was to inform Jackson that he cannot contact teachers, coaches, or students "during the day-to-day operations of the school."

The restriction on Jackson's *on*-campus communication with school officials and students did not amount to a violation of clearly established law. Jackson does not point to a single decision of this Court, the Supreme Court of the United States, or the Georgia Supreme Court that articulates even the general framework for assessing claims that a school official impermissibly restricted a parent's rights under the First Amendment on school property. And the few decisions of our sister circuits reviewing claims similar to Jackson's have uniformly concluded that there is no clearly established right for parents to access school property to exercise their rights under the First Amendment. *See Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017) (holding that school official was entitled to qualified immunity for "bann[ing] [the plaintiff] from [school] property for purposes other than attendance at sporting events" because "we cannot conclude that a parent has a general and unlimited First Amendment

19

right of access to school property"); *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999) (holding that there was no federal jurisdiction over a claim predicated on the exclusion of a parent from school premises because the claim was "plainly insubstantial and entirely frivolous" and "a monument to what ought not to be in a federal court" (internal quotation marks omitted)).

In the absence of any controlling precedent that establishes even the general rubric for determining whether official conduct violates the Constitution, it is impossible to say that "a broader, clearly established principle . . . should control the novel facts of the situation." *Loftus*, 690 F.3d at 1204 (alteration adopted and citation omitted). And one cannot say that McCurry's conduct "so obviously violate[d]" the Constitution "that prior case law is unnecessary," *id.* at 1205 (citation omitted), in the light of the duty of school officials to prevent "the kind of boisterous and threatening conduct" that would interrupt the "peace and quiet" required for the academic aspects of a school's functions. *Carey v. Brown,* 447 U.S. 455, 470–71 (1980) (quoting *Gregory v. Chicago*, 394 U.S. 111, 118 (1969) (Black, J., concurring)). So we have little difficulty concluding that Jackson's claim is barred by qualified immunity.

### C. McCurry Did Not Violate Clearly Established Law When He Prohibited Jackson from Addressing the School Board.

Jackson also argues that McCurry violated the First Amendment by prohibiting him from attending and addressing a meeting of the local school

20

board for threatening litigation against school officials, but we conclude that McCurry is entitled to qualified immunity with respect to this claim. We begin by placing the meetings of the school board within the "forum analysis" framework dictated by Supreme Court precedent "to evaluate government restrictions on purely private speech that occurs on government property," *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015), and then turn to evaluate Jackson's claim under the First Amendment.

All parties argue—and we agree—that a meeting of the school board qualifies as a limited public forum, at least insofar as each meeting includes a period for public comment in which the board may entertain citizen complaints if it chooses to do so. Board policy does not grant blanket permission to citizens to address the board, as would be the case if the board meeting were a designated public forum. Instead, the board "limits discussion to certain topics and employs a system of selective access." *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017). As explained in the school handbook, public comment is limited by topic to "citizen complaints" that "cannot be resolved by the administration."

The policy also requires each citizen who desires to voice a complaint to "obtain permission from the governmental proprietor of the forum," *Barrett*, 872 F.3d at 1225, by "submit[ting] a written request to the Superintendent

21

stating their name, home address, the topic about which they wish to speak and the group they represent, if applicable, no later than 12 o'clock on Thursday prior to the scheduled Board meeting." And the board evidently "has discretion to grant or deny permission" to address the meeting, *Barrett*, 872 F.3d at 1225, because the policy states only that the board will "*consider*" hearing citizen complaints that have not been resolved by the school administration. Because "only those speakers who satisfy the Policy's substantive and procedural criteria may speak," *id.*, the board's policy qualifies as a system of selective access, and the portion of each board meeting devoted to citizen complaints is a limited public forum.

In a limited public forum, officials may exercise considerable control over which speakers may express their views and the subject matter of their expression, but that discretion is not absolute. "Control over access to a [limited public] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). But in a limited public forum, the usual prohibition on content discrimination is relaxed. As the Supreme Court has explained, in a limited public forum, "content discrimination" may "be permissible if it preserves the purposes of [the] limited forum." *Rosenberger v. Rector &*

22

*Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). With these preliminaries in place, we turn now to examine Jackson's arguments.

Jackson contends that McCurry's decision was motivated by a desire to suppress Jackson's "viewpoint that Oate[s] violated E.D.J.'s constitutional rights," and so violated the prohibition on viewpoint discrimination applicable to limited public fora under *Cornelius* and *Rosenberger*, but Jackson's theory is a nonstarter. A restriction on speech constitutes viewpoint discrimination "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. According to Jackson's own deposition testimony, McCurry did not prohibit Jackson from speaking to the school board because he intended to express any particular opinion or perspective, but instead because he "had threatened litigation" against the school. So it was not Jackson's *view* that provided the rationale for McCurry's decision, but an *action* that Jackson allegedly threatened to take. And even if banning all who threaten litigation could be construed as discrimination against those who hold contrary views, such an interpretation was not so clearly established that we could say McCurry was "plainly incompetent" or "knowingly violate[d] the law." *Malley*, 475 U.S. at 341.

Although a facially neutral restriction on speech adopted with a veiled intent to "suppress a particular point of view" is invalid, *Cornelius*, 473 U.S. at

23

812, there is nothing in the record to support an inference that McCurry's stated justification was pretextual. So we conclude that Jackson's argument about viewpoint discrimination cannot overcome McCurry's defense of qualified immunity. *See Wardynski*, 871 F.3d at 1208.

Jackson also suggests in passing that the board's policy governing the presentation of citizen grievances at board meetings vested McCurry with "unbridled discretion" to determine whether any citizen may address the board in violation of our decisions in *Barrett*, *Soltanic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005), and *United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000), but Jackson forfeited review of this issue. Jackson did not raise this argument before the district court, and as a general rule, "an issue not raised in the district court . . . will not be considered by this court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (citation and internal quotation marks omitted).

Indeed, Jackson has not even properly raised this argument on appeal. Jackson's brief obliquely states that the school system "vested McCurry with unbridled discretion to determine whether R. Jackson could speak to the school board on this subject," and his analysis of the "clearly established" element of the qualified-immunity inquiry includes an undeveloped assertion that "McCurry had clear and fair warning the exercise of his unbridled discretion to

24

prohibit R. Jackson from speaking to the school board on a matter of constitutional importance could be a prior restraint on his right to free speech." Jackson's reply brief also asserts that "McCurry's unbridled discretion denying R. Jackson an opportunity to speak to the school board based on his viewpoint constitutes a violation of the First Amendment." But a trio of stray references to a theory does not suffice to present it.

As we have explained, "[a]bandonment of an issue can . . . occur when passing references appear in the argument section of an opening brief, particularly when the references are mere 'background' to the appellant's main arguments or when they are 'buried' within those arguments." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014). The "passing references" to an unbridled-discretion issue in Jackson's briefs "are nothing more than conclusory assertions," and "[t]he brief makes no argument . . . to support those conclusory assertions." *Id.* And although Jackson's *amicus*, the American Civil Liberties Union of Georgia, provides a more developed version of this unbridled-discretion challenge, we "will not consider issues raised in an amicus brief that were neither raised in the district court nor argued by appellants on appeal" as a general rule. *Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1330 (11th Cir. 2013) (citation and internal quotation marks omitted). We see no reason to deviate from our settled practice in this appeal, so

25

we will not consider Jackson's argument that the board's policy vested

McCurry with unbridled discretion to determine who could address the school

board.

### D. Smith, Kemp, and Veliz Did Not Violate Clearly Established Law by Removing Jackson from the Volleyball Game.

Jackson argues that Smith, Kemp, and Veliz violated his rights under the

Fourth Amendment when they stopped him and asked him to leave his daughter's

volleyball game, but we conclude that their actions did not violate clearly

established law. Jackson does not attempt to argue that we have already decided "a

materially similar case" or that "the conduct involved . . . so obviously violate[s]

the [C]onstitution that prior case law is unnecessary." *Loftus*, 690 F.3d at 1204–05

(alteration adopted) (citation and internal quotation marks omitted). Instead,

Jackson argues that the officials violated the generic requirement that a seizure that

falls short of a full-blown arrest requires the support of "a reasonable, articulable

suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). And he argues that the alleged

seizure was "excessive and unreasonable" because Smith "did not have any right to

use any degree of force in seizing" Jackson under our decisions in *Reese v.*

*Herbert*, 527 F.3d 1253 (11th Cir. 2008), and *Evans v. Stephens*, 407 F.3d 1272

(11th Cir. 2005).

26

Jackson's argument that the officials acted without reasonable suspicion fails to establish that they violated clearly established law because the officials arguably had reasonable grounds to suspect Jackson of criminal trespass. Under Georgia law, "[a] person commits the offense of criminal trespass when he or she knowingly and without authority" "[e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice from . . . an authorized representative of the owner or rightful occupant that such entry is forbidden," O.C.G.A. § 16-7-21(b), or "[r]emains upon the land or premises of another . . . after receiving notice from . . . an authorized representative of the owner or rightful occupant to depart." *Id.* § 16-7-21(b)(3). The record attests that Smith witnessed McCurry's earlier ejection of Jackson from school premises when Jackson appeared at the school to speak with Veliz after Oates searched E.D.J.'s cellphone. After that encounter, McCurry advised Smith that Jackson was not permitted on school premises and told Smith that he had informed Jackson not to appear on campus. And before Smith removed Jackson, Kemp called Veliz to confirm that Jackson was not permitted on school property and was informed by Kemp that they should remove Jackson from the school.

In this circumstance, it is at least arguable that the officials had the "minimal level of objective justification" sufficient to support a limited stop for the purpose of ascertaining whether Jackson was lawfully present at the game and asking him

27

to leave when he could not satisfy them that he was permitted to be on school property. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation omitted). And under our precedents, arguable suspicion suffices to establish an entitlement to qualified immunity.  As we have explained, "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).

Jackson argues that the stop could not have been lawful because McCurry's letter permitted Jackson to appear on campus for the purpose of observing E.D.J.'s volleyball games, but it is undisputed that neither Smith, Kemp, nor Veliz had read the letter when the "seizure" and ejection occurred. Under our caselaw, "[a] law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Sauls*, 206 F.3d at 1165–66. And although a copy of the letter was on Veliz's desk when she spoke with Kemp and authorized the ejection of Jackson from the game, her failure to read the letter was not obviously unreasonable because she was out of town when the altercation at the volleyball game occurred. So we conclude that Jackson's argument about reasonable suspicion does not overcome the qualified-immunity defense raised by Smith, Kemp, and Veliz.

28

Jackson's argument that Smith used excessive force also fails to establish that Smith breached a duty under clearly established law. Jackson testified that Smith's grip on his arm was not painful and that he was unaware if it caused him any injury. It follows that the force used on Jackson "was de minimis," and as we have explained, "[d]e minimis force will only support a Fourth Amendment excessive force claim when 'an arresting officer does not have the right to make an arrest.'" *Zivojinovich v. Barner*, 525 F.3d 1059, 1072 (11th Cir. 2008) (quoting *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006)). And because Smith arguably had a right to detain Jackson, the conclusion that Smith used excessive force is not "beyond debate." *al-Kidd*, 563 U.S. at 741.

In any case, Smith's modest use of force against Jackson was arguably reasonable. As we have explained, "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). It is arguable that Smith reasonably believed that Jackson had been hostile with school officials on several earlier occasions and so had reason to suspect that a modicum of force was warranted to maintain control over the situation. We conclude that Smith is entitled to qualified immunity with respect to Jackson's claim under the Fourth

29

Amendment and that Kemp and Veliz are immune from suit for approving Smith's removal of Jackson from the game.

## IV. CONCLUSION

We **AFFIRM** the summary judgment against the Jacksons and in favor of the school officials.